1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT

9

SOUTHERN DISTRICT OF CALIFORNIA

10

11    MONIQUE A.,[1]                                  Case No.:  23cv1981-LR

12                              Plaintiff,      **ORDER REGARDING JOINT**

13    v.                                        **MOTION FOR JUDICIAL REVIEW**

14    CAROLYN W. COLVIN,                        **[ECF No. 12]**

15    Acting Commissioner of the Social
      Security Administration,[2]

16                              Defendant.

17

18          On October 26, 2023, Monique Collette A. ("Plaintiff") filed a Complaint pursuant

19    to 42 U.S.C. § 405(g) seeking judicial review of a decision by the Commissioner of

20    Social Security ("Defendant") denying Plaintiff's application for social security disability

21    benefits and supplemental security income benefits.  (ECF No. 1.)  Now pending before

22

23    _____

24    [1]  Pursuant to Civil Local Rule 7.1(e)(6)(b), the Court's opinions in Social Security cases filed under

25    42 U.S.C. § 405(g) "refer to any non-government parties by using only their first name and last initial."

26    [2]  Plaintiff named Kilolo Kijakazi, who was the Acting Commissioner of Social Security when Plaintiff
      filed her Complaint on October 26, 2023, as a Defendant in this action.  (See ECF No. 1 at 1.)  Carolyn

27    W. Colvin is now the Acting Commissioner of Social Security Administration, and she is automatically

28    substituted as a party pursuant to Federal Rule of Civil Procedure 25(d).

the Court is the parties' "Joint Motion for Judicial Review" seeking judicial review. (ECF No. 12 ("J. Mot.").)  For the reasons discussed below, the Court **ORDERS** that judgment be entered affirming the decision of the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g).

## I.  PROCEDURAL BACKGROUND

On March 12, 2020, Plaintiff filed an application for disability insurance benefits under Title II of the Social Security Act and supplemental security income benefits under Title XVI of the Social Security Act, alleging disability beginning on May 21, 2018. (ECF No. 8 ("AR")[3] at 70, 80, 243–49, 250–55.)  After her application was denied initially and upon reconsideration, Plaintiff requested an administrative hearing before an administrative law judge ("ALJ").  (Id. at 154–55.)  An administrative hearing was held on January 27, 2022.  (Id. at 39–69.)  Plaintiff appeared at the hearing with counsel, and testimony was taken from her and a vocational expert ("VE").  (Id.)

On July 7, 2022, the ALJ issued a written decision finding that Plaintiff had not been under a disability, as defined in the Social Security Act, from May 21, 2018, through the date of the decision.  (Id. at 31–32.)  The ALJ's decision became the final decision of the Commissioner on August 23, 2023, when the appeals council denied Plaintiff's request for review.  (Id. at 1–6.)  This timely civil action followed.  (See ECF No. 1.)

## II.  SUMMARY OF THE ALJ'S FINDINGS

The ALJ followed the Commissioner's five-step sequential evaluation process. See 20 C.F.R. § 404.1520.  At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the application date.  (AR at 20.)  At step two, the ALJ

---

[3] "AR" refers to the Administrative Record filed on December 22, 2023.  (ECF No. 8.)  The Court's citations to the AR in this Order are to the page numbers listed on the original document rather than the page numbers designated by the Court's Case Management/Electronic Case Filing System ("CM/ECF"). For all other documents, the Court's citations are to the page numbers affixed by CM/ECF.

found that Plaintiff had the following severe impairments: impingement of the left shoulder, degenerative disc disease of the cervical spine status post anterior fusion, and headaches.  (Id.)  At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in the Commissioner's Listing of Impairments.  (Id. at 23.)

Next, the ALJ determined that Plaintiff had the residual functional capacity ("RFC") to:

> perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the claimant can never climb ladders, ropes and scaffolds, occasionally balance, stoop, kneel, crouch, crawl and climb ramps and stairs, can only occasionally drive, can occasionally reach overhead bilaterally, frequently feel with the left hand, frequently handle and feel bilaterally, must avoid concentrated exposure to hazards such as unprotected heights, moving mechanical parts and ambulating over uneven terrain, can have no exposure to bright lights.

(Id. at 24.)

At step four, the ALJ found that Plaintiff could perform her past relevant work as an information clerk.  (Id. at 29.)  Alternatively, at step five, based on the VE testimony, the ALJ found that a hypothetical person with Plaintiff's vocational profile and RFC could perform the requirements of occupations that existed in significant numbers in the national economy.  (Id. at 31.)  The ALJ then found that Plaintiff was not disabled from May 21, 2018, through the date of the ALJ's decision.  (Id.)

### III.  DISPUTED ISSUES

As reflected in the parties' Joint Motion, Plaintiff is raising the following issues as the grounds for reversal and remand: (1) whether the ALJ erred at step two of the sequential analysis by finding that Plaintiff's cervical radiculopathy was not a severe, medically determinable impairment; (2) whether the ALJ failed to offer specific, clear, and convincing reasons for rejecting Plaintiff's testimony; and (3) whether the ALJ's RFC assessment is supported by substantial evidence.  (J. Mot. at 9–10.)

/ / /

# IV.  STANDARD OF REVIEW

Section 405(g) of the Social Security Act allows unsuccessful applicants to seek judicial review of the Commissioner's final decision.  42 U.S.C. § 405(g).  The scope of judicial review is limited, and the denial of benefits will not be disturbed if it is supported by substantial evidence in the record and contains no legal error.  See id.; Buck v. Berryhill, 869 F.3d 1040, 1048 (9th Cir. 2017).  "Substantial evidence means more than a mere scintilla, but less than a preponderance.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Revels v. Berryhill, 874 F.3d 648, 654 (9th Cir. 2017) (quoting Desrosiers v. Sec'y Health & Hum. Servs., 846 F.2d 573, 576 (9th Cir. 1988)).  In determining whether the Commissioner's decision is supported by substantial evidence, a reviewing court "must assess the entire record, weighing the evidence both supporting and detracting from the agency's conclusion," and "may not reweigh the evidence or substitute [its] judgment for that of the ALJ."  Ahearn v. Saul, 988 F.3d 1111, 1115 (9th Cir. 2021).  Where the evidence can be interpreted in more than one way, the court must uphold the ALJ's decision.  Id. at 1115–16; Attmore v. Colvin, 827 F.3d 872, 875 (9th Cir. 2016).  The court may consider "only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which [he or she] did not rely."  Revels, 874 F.3d at 654 (internal quotation omitted).

# V.  RELEVANT MEDICAL RECORDS AND TESTIMONY

## A.  Examination Findings

### 1.  Nurse practitioner's examination

On May 2, 2018, Nurse Practitioner ("N.P.") Aimee Cason evaluated Plaintiff for neck pain, left-sided arm pain and tingling, and migraines.  (AR at 789–95.)  Plaintiff reported worsening neck pain since her last car accident and surgery.  (Id. at 790.)  She explained that after her first surgery, her pain was reduced, but she subsequently had a second car accident, which worsened the pain.  (Id.)  Plaintiff reported numbness and tingling in her left hand, but no loss of strength, and stated that her pain was 5/10.  (Id. at

790, 793.)  N.P. Cason noted that Plaintiff's neck and cervical spine were abnormal and weak, but her cervical spine rotation was normal.  (Id. at 792.)  N.P. Cason found that Plaintiff's spinal alignment was unremarkable, the surrounding soft tissues were normal, the hardware appeared intact, and prescribed her Neurontin and Motrin.  (Id. at 789, 792.)

### 2. Neurosurgical and neurological examinations

On May 24, 2018, Plaintiff had a C-spine MRI, which showed post-surgical changes of prior anterior cervical discectomy and fusion at C4–C6.  (Id. at 758–59.)  On May 29, 2018, Plaintiff had an appointment with Dr. Angela Viers, a neurosurgeon, to address her neck and arm pain.  (See id. at 762–71.)  Plaintiff reported pain radiating down her left arm, tingling in her left hand fingers, and occasional tingling in her right hand fingers.  (Id. at 764.)  She stated that her pain was 3/10 on a good day, and 7–9/10 on a bad day.  (Id.)  In addition, Plaintiff noted that she experienced "severe" migraines about two-to-three times per week.  (Id.)  Dr. Viers reported that Plaintiff had radiculopathy of the cervical region, weak arms, and reduced strength.  (Id. at 765.)  Dr. Viers diagnosed Plaintiff with cervical neuroforaminal stenosis and ordered further evaluation for potential surgery planning.  (Id.)

On June 18, 2018, Dr. Sherwin Cho, a neurologist, conducted a nerve conduction study and electromyogram based on Plaintiff's previous examinations and MRI.  (See id. at 747–53, 757–58.)  Dr. Cho stated that Plaintiff had experienced numbness and weakness for the past fifteen years, which had worsened since 2016.  (Id. at 747.)  He noted "evidence of a mild and acute on chronic denervation of the biceps muscle, and mild chronic denervation of the triceps muscle in the left upper limb consistent with acute on chronic left C6 radiculopathy."  (Id. at 749.)  Dr. Cho further stated that there was no "evidence of neuropathy that may explain the numbness in the left hand."  (Id.)

On June 22, 2018, Dr. Viers examined Plaintiff, who denied any new symptoms.  (Id. at 743.)  Dr. Viers determined that Plaintiff's EMG studies "confirmed the left C6 acute on chronic radiculopathy," and the Plaintiff's CT "confirmed that the C5–6 levels did not fuse."  (Id. at 744.)  Plaintiff elected to move forward with surgery for a C5–6 left

laminoforaminotomy and posterior spinal fusion.  (Id.)  On July 3, 2018, Plaintiff reported weakness, as well as neck and arm pain, with a pain level of 7/10.  (Id. at 719.)

On July 9, 2018, Plaintiff had a surgery for a C5–6 left laminoforaminotomy and posterior spinal fusion.  (Id. at 698.)  During post-surgery consultation, Plaintiff reported moderate pain and stiffness in her neck.  (See id. at 687–93.)

On August 7, 2018, Plaintiff had a postsurgical follow-up appointment with Dr. Viers.  (Id. at 631–32.)  Plaintiff reported that her pain was "moderate" 5/10, and she was doing "very well."  (Id. at 631.)  She stated that her neck pain and the pain radiating down her arm were "gone."  (Id.)  Plaintiff noted that her strength had returned, but she continued to feel numbness and tingling in her left thumb.  (Id.)  Dr. Viers recommended that Plaintiff stop taking Oxycodone and wean off Diazepam.  (Id. at 632.)

On October 1, 2018, Plaintiff had an appointment with Dr. Viers for surgical aftercare.  (Id. at 558–65.)  Plaintiff reported that her neck and arm pain decreased; however, she continued to have pain in the left thumb and shoulder, and experienced weakness and fatigue.  (Id. at 564.)  Furthermore, Plaintiff reported that she had trouble sleeping, but her lack of sleep was not always related to pain.  (Id.)  She requested a handicap placard because she struggled to walk short distances, although in the past, she had been able to walk over four miles.  (Id.)  Dr. Viers noted that Plaintiff had a "[s]table appearance of anterior and posterior cervical spinal fusion without evidence of hardware or osseous complication."  (Id. at 565.)  Dr. Viers determined that Plaintiff was healing as expected post-operatively and noted that many of Plaintiff's complaints were consistent with depression.  (Id.)

On May 31, 2019, Plaintiff had an appointment with Dr. Kenneth Villa, a neurologist.  (Id. at 924–27.)  She reported significant headaches and neck pain.  (Id. at 924.)  Dr. Villa's physical examination of Plaintiff revealed 5/5 strength in the upper and lower limbs, intact coordination and reflexes, and normal gait.  (Id. at 926.)  Dr. Villa prescribed Gabapentin and Topiramate to treat Plaintiff's migraines.  (Id. at 927.)

23cv1981-LR

On October 11, 2019, Plaintiff had another appointment with Dr. Villa to address neck pain and daily headaches.  (Id. at 872–76.)  Plaintiff reported significant headaches over the right frontal area, which she described as "a sharp pain that radiated into the back right and left side of her head."  (Id. at 872.)  She stated that she had visual symptoms, described as "orbs," and her migraines lasted three-to-eight days.  (Id.)  Dr. Villa noted that Plaintiff had 5/5 strength in the upper limbs and normal gait.  (Id. at 873.)  He opined that Plaintiff's "previous anterior fusion surgery[4] from C4 to C6, [was] almost certainly solid," and that Plaintiff had mild-to-moderate neural foraminal narrowing.  (Id. at 874.)  Dr. Villa determined that Plaintiff had a chronic migraine without aura, intractable, without status migrainosus; degenerative disc disease, cervical; and a history of cervical vertebral fusion.  (Id. at 874–75.)

### 3.  Family medicine examinations

On April 12, 2019, Plaintiff had an appointment with Dr. Jorge Pelayo-Garcia, a family medicine specialist, to address her migraines lasting three-to-four days.  (Id. at 856–58.)  Dr. Pelayo-Garcia noted that Plaintiff had severe photophobia with TMJ tenderness, but no neuro defects, and limited range of motion in her neck.  (Id. at 856–57.)  Dr. Pelayo-Garcia also stated that although Plaintiff was prescribed Oxycodone "to use for severe pain," Plaintiff reported not taking the medication "because of the need for her to be driving and taking care of her mother."  (Id. at 856.)

---

[4]

    Spinal fusion is surgery to join two or more vertebrae into one single structure.  The goal is to stop movement between the two bones and prevent back pain.  Once they are fused, they no longer move like they used to.  This keeps a patient from stretching nearby nerves, ligaments, and muscles that may have caused discomfort.

Kelly Miller, What is Spinal Fusion?, WebMD, https://www.webmd.com/back-pain/spinal-fusion-facts (last visited Nov. 22, 2024).

On May 1, 2019, Plaintiff had an appointment with Dr. Cheng–I Lin, a family medicine specialist, and reported that she continued to have daily headaches and significant neck pain.  (Id. at 859.)  Dr. Cheng–I Lin prescribed Gabapentin and Indomethacin.  (Id. at 861.)

On August 27, 2019, Plaintiff had another appointment with Dr. Cheng–I Lin to address neck pain and migraines.  (Id. at 865.)  She had significant pain along the left mid trapezius muscle border and pain with range of motion.  (Id. at 866.)  Dr. Cheng-I Lin prescribed Gabapentin, Topiramate, Naproxen, and Oxycodone for pain.  (Id. at 867.)

On September 25, 2019, Plaintiff had an MRI of her cervical spine.  (Id. at 1090.)  Dr. Robert Prager reviewed the results and opined that Plaintiff's previous anterior fusion surgery from C4 to C6 was "almost certainly solid," and that Plaintiff had "mild right and moderately severe left C6–7 neural foraminal narrowing."  (Id. at 1090–91.)

On December 31, 2019, Plaintiff had an appointment with Dr. Cheng–I Lin.  (Id. at 893.)  Plaintiff had pain in her neck "on all range of motion," and Dr. Cheng–I Lin opined that Plaintiff had "chronic neck pain."  (Id. at 894.)

On March 31, 2021, Plaintiff had another appointment with Dr. Cheng–I Lin, and reported that after taking Lyrica, her sensation had improved.  (Id. at 1166.)  Dr. Cheng–I's physical examination of Plaintiff revealed that her neurology was intact.  (Id. at 1167.)

A month later, after a fall, Plaintiff had an appointment with Dr. Jorge Mota, a family medicine specialist.  (Id. at 1169–71.)  Dr. Mota's physical examination of Plaintiff revealed that she had full grip strength and range of motion in her hands.  (Id. at 1170.)

On June 6, 2021, Plaintiff had an appointment with Dr. Cheng–I Lin, and reported worsening acute pain, in addition to chronic pain from her recent car accident on May 29, 2021.  (Id. at 1177–79.)  Dr. Cheng–I Lin noted that Plaintiff had pain in the upper/middle trapezius area, as well as in the mid back area with flexion, and prescribed Fluconazole, Pregabalin, and Topiramate.  (Id. at 1179.)

/ / /

#### 4. Urgent care and emergency room examinations

On October 31, 2020, Plaintiff went to urgent care complaining of constant, moderate pain that radiated up and down her left arm due to an IV that had been placed in her arm several days before. (<u>Id.</u> at 1123–27.) Dr. Sarah Holgren examined Plaintiff and noted that she had a full range of motion in her neck, intact sensation in her arm, but Plaintiff's motor function in her elbow was 4/5 due to pain. (<u>Id.</u> at 1124.)

On November 3, 2020, Dr. Peter Solomon examined Plaintiff in the emergency room for left arm pain. (<u>Id.</u> at 1086–89.) Plaintiff reported that her medication relieved some chronic pain, and denied trauma, weakness, or numbness. (<u>Id.</u> at 1086.) Dr. Solomon noted that Plaintiff had a full range of motion in her shoulders, and intact strength and sensation. (<u>Id.</u> at 1087.)

On May 29, 2021, Dr. Joshua Rosenbaum examined Plaintiff in the emergency room after a motor vehicle collision. (<u>Id.</u> 1095–98.) Plaintiff reported whiplash-type injuries, as well as shoulder and neck pain, but denied numbness or tingling. (<u>Id.</u> at 1095.) Dr. Rosenbaum noted that Plaintiff had a full range of motion in her neck, with no weakness or deficits, and that she responded well to treatment. (<u>Id.</u> at 1096.) Dr. Rosenbaum determined that there was no acute fracture or malalignment of the cervical spine. (<u>Id.</u> at 1098.)

#### 5. Physical therapy

After Plaintiff's July 9, 2018, surgery, she had physical therapy from July 24, 2018 through October 15, 2018 with Dr. Sarah Villena. (<u>See</u>, <u>e.g.</u>, <u>id.</u> at 507–08, 521–22, 530–32, 569–71, 578–80, 594–96, 610–12, 633–35, 636–38, 640–42.) Plaintiff reported neck pain during every session. (<u>See id.</u>) In addition, during multiple sessions Plaintiff reported increased headaches. (<u>See id.</u> at 507, 530, 569, 594.) Despite Plaintiff's reported pain, Dr. Villena noted that Plaintiff was able to complete the recommended exercises. (<u>Id.</u> at 522, 532, 570, 580, 595, 611, 633, 637, 641.) Plaintiff was able to progress out of her neck brace and walk continuously for thirty minutes, but she was still experiencing increased pain. (<u>Id.</u> at 508.) On October 15, 2018, Dr. Villena noted that

Plaintiff had to defer physical therapy until her pain subsided and she could tolerate physical therapy better.  (Id.)

From July 2021, through December 2021, Plaintiff received physical therapy treatment with Physical Therapist ("P.T.") Sean Hill for about four-and-a-half months due to neck pain and a possible rotator cuff tear due to her most recent motor vehicle accident.  (See id. at 1353–1475.)  Plaintiff was unable to drive for more than an hour-and-a-half, lift light objects, and work out due to pain.  (Id. at 1353.)  During her physical therapy sessions, Plaintiff had constant neck pain, which was aggravated by arm and hand movements, but was alleviated by rest or decreased activity.  (See id. at 1353, 1357, 1361, 1365, 1369, 1373, 1379, 1383, 1387, 1390, 1397, 1401, 1405, 1412, 1416, 1420, 1424, 1428, 1431, 1435, 1442, 1446, 1450, 1457, 1460, 1464, 1468.)  During multiple sessions, Plaintiff reported increased, severe pain that limited her ability to perform various activities.  (See id. at 1353, 1365, 1369, 1390, 1397, 1412, 1420.)  However, during multiple sessions, Plaintiff also reported decreased, mild-to-moderate pain.  (See id. at 1357, 1361, 1373, 1379, 1383, 1387, 1401, 1405, 1416, 1424, 1428, 1435, 1442, 1446, 1451, 1457, 1460, 1468.)  At Plaintiff's last session, on December 9, 2021, P.T. Hill documented Plaintiff's reports that her headache and neck pain decreased, and her left shoulder and cervical range of motion increased.  (Id. at 1470.)  P.T. Hill recommended that Plaintiff continue the treatment through an independent home program.  (Id.; see also id. at 1475.)

**6.  Other examinations**

On November 14, 2019, Dr. Mike Kuoppamaki, a chiropractor, evaluated Plaintiff, and Plaintiff reported 10/10 discomfort.  (Id. at 833–39.)  Plaintiff described the pain as aching, sharp, deep, continuous, intense, and severe.  (Id. at 838.)  Dr. Kuoppamaki's examination of Plaintiff revealed areas of spasm, hypomobility, and end-point tenderness indicative of subluxation, and a significant decrease in the normal range of motion of the cervical region.  (Id.)

On November 11, 2020, Dr. Julia Tran conducted a comprehensive orthopedic examination of Plaintiff.  (Id. at 1072–78.)  Plaintiff reported pain in her neck, and trouble bathing, showering, driving, and preparing meals.  (Id. at 1073.)  Dr. Tran noted that Plaintiff walked with a mildly antalgic gait and was able to tandem walk.  (Id. at 1074.)  Plaintiff had tenderness and reduced range of motion in her cervical spine, but full lumbar, hip, knee, ankle, and shoulder range of motion.  (Id. at 1074–75.)  Plaintiff had reduced sensation over the left C5 dermatome, but otherwise normal sensation, reflexes, and strength.  (Id. at 1076.)  Dr. Tran opined that Plaintiff had post cervical fusion pain, cervical degenerative disc disease, neck pain with radiculopathy, chronic headache, and left shoulder and right heel pain.  (Id. at 1077.)  Dr. Tran further determined that Plaintiff could occasionally lift twenty pounds and frequently lift ten pounds, and stand, walk, and sit for six out of eight hours in a workday.  (Id.)  Dr. Tran also opined that Plaintiff had no postural limitations.  (Id.)  With respect to workplace and environmental limitations, Dr. Tran opined that Plaintiff was restricted to "occasional" driving due to reduced cervical range of motion, but "[t]here [wa]s no other workplace limitation."  (Id.)  Additionally, Dr. Tran determined that Plaintiff had limitations on manipulative, lifting, and climbing activities.  (Id. at 1078.)

### 7.  State agency medical consultants

On April 20, 2020, Dr. M. Yee reviewed Plaintiff's medical history and concluded that Plaintiff could perform light work, and her limitations did not prevent her from working in customer service industry.  (See id. at 70–79.)  On December 15, 2020, on reconsideration, Dr. Julie Chu reviewed Plaintiff's medical history and determined that Plaintiff could perform light work, and her limitations did not prevent her from performing her past customer service job.  (Id. at 103, 106.)

/ / /

/ / /

/ / /

/ / /

**B.**    **Plaintiff's Testimony and Statements, and Third-Party Report**

   **1.  Plaintiff's testimony during administrative hearing**

On January 27, 2022, Plaintiff testified that she lived with her mother and daughter.  (Id. at 44.)  She stated that she was not collecting public benefits, and her medical care was covered by TRICARE.  (Id.)

Plaintiff testified that at the time of the hearing, she worked part-time as an Uber Eats driver, driving about twelve hours per week, and made less than $1,200 per month. (Id. at 46–47.)  Before driving for Uber, Plaintiff had worked at JKC Palms Springs Automotive for two years as a business development center representative.  (Id. at 47.) Plaintiff called customers to persuade them to purchase a vehicle, took credit applications, and discussed credit ratings.  (Id.)  Plaintiff subsequently moved to Courtesy Chevrolet, where she performed the same job functions.  (Id.)  Thereafter, Plaintiff worked at City Chevrolet, where she sold cars, talked to customers, and took credit applications.  (Id. at 47–48.)

Plaintiff further testified that she was able to drive for Uber but was unable to work full-time due to her migraines, as well as neck and arm pain.  (Id. at 48–49.)  She stated that she was in a car accident in 2014 and 2016, had multiple surgeries on her neck, and despite medical care, was still in pain.  (Id. at 50–51.)

Plaintiff reported significant swelling in her arm, which caused pain and tiredness to the point where "it feel[t] like somebody [wa]s constantly just hitting [her] whole upper area."  (Id. at 48.)  She stated that she was diagnosed with radiculopathy that caused "constant" numbness and tingling in her hands, which had increased since her July 2018 neck surgery.  (Id. at 56.)  Plaintiff also testified that she was unable to lift or carry anything over five pounds and did not have grip strength in her right hand due to difficulties with her trigger finger.  (Id. at 57.)  Additionally, because of the pain in her hand, she dropped items when she tried to pick them up.  (Id.)

As for her migraines, Plaintiff reported that fluorescent lights, smells, and even talking caused migraines, which lasted three-to-five days.  (Id. at 48.)  She always wore

sunglasses, unless she was in her apartment with window blinds closed.  (Id. at 49.)
Plaintiff's last employer allowed her to wear sunglasses and a hat inside, and turned off
the office lights and lit the room with natural light.  (Id. at 58.)  Once or twice a month,
when her migraines were bad, Plaintiff had to leave work and go home.  (Id. at 59.)  She
was able to drive for Uber because her car windows were completely tinted, and she did
not drive at night because she could not see.  (Id. at 49–50.)

Plaintiff further testified that her neck pain ranged between 6–7/10, and the pain
caused difficulties driving, reaching, sitting, and taking a shower.  (Id. at 52.)  Sitting and
holding her head upright put pressure on her neck and shoulders and caused pain.  (Id. at
49.)  Plaintiff could not sit upright for more than two hours; otherwise, she would be "laid
out for a few days afterwards."  (Id. at 55.)  Further, she stated that she could not sit in an
office chair for more than two hours, had to adjust her position while driving, and lie
down for most of the day due to sharp pain in her neck.  (Id. at 55–56.)  Plaintiff also
stated that she could not drive for more than two hours and two consecutive days for
Uber Eats due to pain.  (Id. at 59.)

Additionally, Plaintiff stated that she had constant swelling in the neck area with
pain despite medication, heat pads, and ice packs.  (Id. at 53.)  She tried physical therapy,
but it worsened her pain, and she had to go to the emergency room the day after her
therapy session because of pain.  (Id. at 53–54.)

Plaintiff also testified that her migraines and neck pain had worsened since her
second surgery.  (Id. at 59.)  She was taking Topiramate for migraines, and Oxybutynin,
Pregabalin, and Oxycodone for pain.  (Id. at 52.)

### 2. Plaintiff's disability report and headache questionnaire

Plaintiff stated in her disability report that she stopped working on January 1, 2018,
because her company eliminated the department she worked in.  (Id. at 294.)   She further
stated that her medical conditions had prevented her from working since May 15, 2018.
(Id.)  Plaintiff listed the following medical conditions that limited her ability to work:
severe nerve damage on her neck, nerve damage on her left arm, numb left arm and hand,

severe migraines, and asthma.  (Id.)  In Plaintiff's subsequent disability report, in addition to her previous medical conditions, Plaintiff reported that her "migraines [were] more constant.  The left side of [her] neck [and] arm[,] to the bottom of [her] left hand [were] in constant pain."  (Id. at 338.)

On July 8, 2020, Plaintiff completed a headache questionnaire and reported that she had headaches "just about every day" lasting five-to-six days.  (Id. at 326.)  She further stated that she had "stabbing" pain in her head that made her nauseous, and she could not open her eyes due to light sensitivity.  (Id.)  Plaintiff also stated that her medications did not provide relief.  (Id. at 326–27.)

### 3.  Third-party report from Plaintiff's daughter

On February 2, 2022, Plaintiff's daughter Taliyah wrote a letter describing Plaintiff's migraines.  (Id. at 368.)  She stated that Plaintiff suffered from "extremely strong" migraines occurring five times per month, and lasting three-to-five days.  (Id.)  When she had a migraine, Plaintiff struggled to physically function, keep food down, or perform her daily activities, like bathing, and Taliyah had to take care of both Plaintiff and Plaintiff's mother.  (Id.)

## VI.  DISCUSSION

### A.    The ALJ Erred at Step Two of the Sequential Evaluation Process by Failing to Consider Plaintiff's Cervical Radiculopathy, but the ALJ's Error was Harmless

### 1.  Parties' arguments

Plaintiff argues that the ALJ erred at step two of the sequential evaluation process by finding that Plaintiff's cervical radiculopathy was not a severe medically determinable impairment.  (J. Mot. at 10–11.)  Plaintiff asserts that Dr. Angela Viers diagnosed her with spondylosis with radiculopathy in the cervical spine region based on an MRI, an EMG/NCV, and a CT scan.  (Id. at 11 (citing AR at 459, 552).)  Plaintiff also states that such tests are objective evidence of cervical radiculopathy.  (Id.)  She further contends that her cervical radiculopathy is "severe" because it limits her ability to perform basic work activities, including rotating her neck, sitting longer than two-to-three hours,

driving, and reaching with her left arm.  (J. Mot. at 11.)  Plaintiff maintains that the ALJ's error was not harmless because substantial evidence did not support the ALJ's RFC assessment.  (Id.)

Defendant argues that the ALJ did not err because the ALJ also found at step two of his sequential evaluation process that Plaintiff had a severe impairment of cervical degenerative disease post anterior fusion surgery.  (Id. at 11–14 (citing AR at 20).)  Additionally, Defendant states that even if the ALJ erred at step two by not specifically addressing Plaintiff's radiculopathy, the ALJ discussed Plaintiff's radicular symptoms later in his written decision, thereby curing any possible error.  (J. Mot. at 14.)

Plaintiff replies that there is a distinction between "cervical radiculopathy" and "degenerative disc disease of the cervical spine," and alleges that the ALJ did not account for Plaintiff's radicular symptoms in his decision.  (Id. at 14–15.)  Plaintiff also argues that the ALJ's summary of the record cannot supplement his analysis of radicular symptoms, and the ALJ did not "directly address or contradict" evidence of Plaintiff's radicular symptoms.  (Id. at 15 (citing AR at 25–27).)  Additionally, Plaintiff states that the ALJ's RFC assessment neither explained how he factored Plaintiff's radicular symptoms into his analysis, nor how he arrived at a light RFC.  (J. Mot. at 10.)

### 2. Applicable law

At step two of the sequential evaluation process, the Social Security Administration considers the medical severity of the claimant's impairment.  20 C.F.R. § 404.1520(a)(4)(ii).[5]  To establish that a medically determinable impairment is "severe," the claimant must show that it "significantly limits [her] physical or mental ability to do basic work activities."  Id. § 404.1520(c).  "Basic work activities" include physical

---

[5]  The disability insurance benefits ("DIB") and supplemental security income ("SSI") regulations relevant to this case are virtually identical; therefore, only the DIB regulations will be cited in the remainder of this order.  Parallel SSI regulations are found in 20 C.F.R. §§ 416.900–416.999 and correspond with the last digits of the DIB cite (e.g., 20 C.F.R. § 404.1520 corresponds with 20 C.F.R. § 416.920).

functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; seeing, hearing, and speaking; understanding, carrying out, and remembering simple instructions; using judgment; responding appropriately to supervision, coworkers, and usual work situations; and dealing with changes in a routine work setting.  Id. § 404.1522(b).

The inquiry at step two of the sequential evaluation process is a "de minimis screening device" to screen for groundless claims.  Edlund v. Massanari, 253 F.3d 1152, 1158 (9th Cir. 2001) ("We have defined the step-two inquiry as 'a de minimis screening device to dispose of groundless claims.'").  The ALJ must consider the "combined effect of all of the claimant's impairments" on the claimant's ability to function "without regard to whether each [impairment] alone was sufficiently severe."  Id. at 1159.  For purposes of step two of the sequential evaluation process, "[a]n impairment or combination of impairments may be found 'not severe only if the evidence establishes a slight abnormality that has no more than a minimal effect on an individual's ability to work.'"  Webb v. Barnhart, 433 F.3d 683, 686 (9th Cir. 2005) (internal citation omitted).

### 3. Analysis

At step two of the sequential evaluation process, the ALJ found that Plaintiff had severe impairments of impingement of the left shoulder, degenerative disc disease of the cervical spine status post anterior fusion,[6] and headaches, and that those impairments significantly limited Plaintiff's ability to perform basic work activities.  (AR at 20.)  The

---

[6] "Degenerative disc disease is . . . a term used to describe the normal changes in [one's] spinal discs as [they] age."  Naddour v. Colvin, No. 13-CV-1407-BAS(WVG), 2014 WL 4724687, at *10 n.12 (S.D. Cal. Sept. 23, 2014); see also What is Degenerative Disk Disease?, WebMD, https://www.webmd.com/back-pain/degenerative-disk-disease-overview (last visited Nov. 20, 2024) (Degenerative disk is a condition caused over time by injuries, sports, daily activities, or if a spinal disk dries out and shrinks.").)

ALJ further found that Plaintiff's nonsevere medically determinable impairments of sinusitis status post bilateral endoscopic DCR, plantar fasciitis of the right foot, dermatitis, asthma, substance abuse, anxiety, and depression, caused no more than minimal limitations on Plaintiff's ability to work.  (Id. at 20–21.)  The ALJ also determined that Plaintiff's chest pain was a non-medically determinable impairment.  (Id. at 22–23.)  The ALJ then found that Plaintiff retained the RFC to perform light work, subject to several enumerated limitations.  (Id. at 24.)

Notably, the ALJ did not discuss Plaintiff's cervical radiculopathy[7] in his step two analysis.  (See id. at 20–23.)  When Plaintiff applied for disability, she alleged, in relevant part, "severe nerve damage" to her neck, nerve damage on the left arm, and numbness in her left arm and hand.  (Id. at 70, 80.)  During Plaintiff's administrative hearing, she testified that she had been diagnosed with radiculopathy.  (Id. at 56.)  In addition, Plaintiff's medical records contain diagnoses and findings of cervical radiculopathy.  (See, e.g., id. at 465, 493, 523, 532, 549, 552–53, 571, 580, 616–29, 649, 687–93, 729–31, 744, 757–61, 765, 774, 777, 780, 789, 792 (containing notes dated February 2018–October 2019, from Plaintiff's medical appointments before and after her spinal surgery, documenting diagnoses and findings of cervical radiculopathy); id. at 784 (containing May 24, 2018 C-spine MRI, finding "left C6 radiculopathy"); id. at 751–53 (containing June 11, 2018 C-spine CT scan findings, listing "provisional diagnosis" of radiculopathy in the cervical region); id. at 747–49 (containing June 18, 2018 nerve conduction study and electromyogram findings listing acute chronic left C6 radiculopathy); id. at 1086–89, 1092–94, 1095–98 (containing records from Plaintiff's May, September, and November 2021, emergency room visits for neck pain with

---

[7]  "Cervical radiculopathy is the damage of disturbance of nerve function that results if one of the nerve roots near the cervical vertebrae is compressed."  Naddour, 2014 WL 4724687, at *9 n.7; see also Cervical Radiculopathy, WebMD, https://www.webmd.com/pain-management/pain-management-cervical-radiculopathy (last visited Nov. 20, 2024).

impressions of "left cervical radiculopathy").)  Moreover, Plaintiff's medical records contain notes from consultative examiner, Dr. Tran, who conducted a comprehensive orthopedic examination of Plaintiff and listed a finding of "[n]eck pain with radiculopathy," as well as from the state agency medical consultant, Dr. Chu, who specifically cited Dr. Tran's diagnoses and findings of "neck pain w/radiculopathy."  (Id. at 101, 120, 1077.)  Because the ALJ's written decision does not have any indication that the ALJ considered Plaintiff's cervical radiculopathy, either as a severe or nonsevere impairment, at step two of the sequential evaluation process, the ALJ erred at step two.  (Id. at 20–23.)

        Having found that the ALJ erred by failing to consider Plaintiff's cervical radiculopathy at step two of his sequential evaluation, the Court needs to determine whether the ALJ's error was harmless.  An error is harmless if it is inconsequential to the ALJ's ultimate nondisability determination.  See Rounds v. Comm'r Soc. Sec. Admin., 807 F.3d 996, 1007 (9th Cir. 2015) (finding that the ALJ's error was harmless because it was "inconsequential to the ultimate nondisability determination"); Tommasetti v. Astrue, 533 F.3d 1035, 1038 (9th Cir. 2008) (internal quotation marks and citation omitted) ("[H]armless error . . . exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate nondisability determination.").  If the ALJ errs at step two, but considers the claimant's impairments at the subsequent steps of the analysis, the error is harmless.  See Cindy F. v. Berryhill, 367 F. Supp. 3d 1195, 1207 (D. Or. 2019) (concluding that because "the ALJ considered all of [p]laintiff's impairments at the subsequent steps of the sequential analysis and in his summary of the medical evidence . . . . even assuming the ALJ erred at step two, that error would have been harmless").

        In this case, the ALJ continued his analysis past step two and considered limitations resulting from Plaintiff's impairments in the RFC analysis.  (See AR at 24–29.)  Specifically, the ALJ considered a June 18, 2018 EMG nerve study, (id. at 25 (citing id. at 749)), and an October 11, 2019 MRI, (id. at 26 (citing id. at 874–75)), which showed Plaintiff's chronic radiculopathy.

Although Plaintiff argues that the ALJ did not discuss Plaintiff's May 2021 CT scan in his written decision, (J. Mot. at 28), the ALJ was not required to discuss every piece of evidence when interpreting the evidence and developing the record.  See Kilpatrick v. Kijakazi, 35 F.4th 1187, 1193 (9th Cir. 2022) ("[A]n ALJ may not ignore significant probative evidence that bears on the disability analysis.  But at the same time, a rule requiring ALJs to address every argument or piece of evidence, however meritless or immaterial, would unduly detain ALJs in their orderly consideration of Social Security disability benefits claims."); Howard ex rel. Wolff v. Barnhart, 341 F.3d 1006, 1012 (9th Cir. 2003); Bell v. Kijakazi, 2022 WL 9731077, at *2 (9th Cir. 2022) (quoting Howard ex rel. Wolff, 341 F.3d at 1012 (9th Cir. 2003)) (providing that "the ALJ is not required to discuss evidence that is neither significant nor probative").  Notably, the CT scan of Plaintiff's cervical spine scan showed "[n]o acute fracture or malalignment of the cervical spine."  (AR at 1098.)  Therefore, because there were no radiculopathy symptoms in the CT scan, the ALJ's failure to discuss the CT scan did not affect his RFC analysis.  Additionally, the ALJ noted that after Plaintiff's surgery in July 2018, she reported "doing very well," and that her "arm and neck pain disappeared."  (Id. at 25 (citing id. 557–58).)

Further, contrary to Plaintiff's assertion that the ALJ erred because he did not consider Plaintiff's pain, muscle weakness, and numbness, which Plaintiff asserts are symptoms of cervical radiculopathy, (J. Mot. at 14), the ALJ did consider these symptoms.  (See AR at 24–25 (specifically noting that Plaintiff reported "pain, numbness, tingling, and mobility limitations"); id. at 25 (noting Plaintiff's reports that she had full muscle strength, and her "neck and arm pain disappeared"); id. at 26 (stating that although Plaintiff initially reported neck and arm pain, and numbness, during a later examination, she "denied any numbness, weakness or tingling"); id. at 27 (stating that "[t]here were many exams where the claimant denied having symptoms such as pain, numbness or weakness"); id. at 28–29 (noting that Plaintiff reported "less pain levels," and had "intact muscle strength").)  The ALJ ultimately determined that Plaintiff's

"reduced spinal range of motion, tenderness over her spine and shoulder, <u>radiculopathy</u>, and diminished sensation" prevented Plaintiff from performing a full range of work activities, and restricted Plaintiff to light work. (<u>Id.</u> at 28 (emphasis added).) Accordingly, the ALJ specifically considered Plaintiff's cervical radiculopathy symptoms in the RFC analysis, and the ALJ's error at step two was therefore harmless.

### 4. Conclusion

The Court finds that the ALJ erred at step two of his sequential evaluation process by not considering Plaintiff's radiculopathy symptoms. Nevertheless, because the ALJ considered Plaintiff's cervical radiculopathy symptoms in the RFC analysis, the error at step two was harmless.

## B.    <u>The ALJ Properly Discounted Plaintiff's Testimony Regarding Symptoms and Limitations</u>

### 1. Parties' arguments

Plaintiff argues that the ALJ failed to offer specific, clear, and convincing reasons to discount Plaintiff's subjective symptom testimony. (<u>See</u> J. Mot. at 15–18.) Plaintiff contends that the examination findings that the ALJ cited in his decision were from appointments where Plaintiff was examined for conditions unrelated to her disabling migraines, left arm and shoulder pain, neck pain, or left arm and hand numbness. (<u>Id.</u> at 16–17.) Plaintiff further argues that the examination findings documenting her normal gait, no migraines, intact hardware, and other improvements did not contradict her reports of disabling symptoms. (<u>Id.</u> at 17–18.)

Defendant responds that the ALJ appropriately evaluated Plaintiff's alleged symptoms. (<u>See id.</u> at 18–25.) Defendant argues that the ALJ discounted Plaintiff's statements because they were inconsistent with the medical record and her daily activities, and because the record contained evidence of Plaintiff's improvement with treatment. (<u>Id.</u> at 21–22.) Additionally, Defendant asserts that the ALJ properly "relied more on a medical opinion and the prior administrative medical findings . . . than on Plaintiff's statements." (<u>Id.</u> at 24.) Defendant therefore maintains that substantial

evidence supported the ALJ's decision to discount Plaintiff's subjective symptom testimony.  (Id. at 24–25.)

Plaintiff replies that the ALJ's stated reasons to discount her subjective symptom testimony were not supported by substantial evidence.  (Id. at 25–26.)  Plaintiff argues that the evidence the ALJ relied on did not address Plaintiff's specific symptoms, she did not improve to the point of non-disability following her second cervical surgery, and the ALJ mischaracterized her daily activities.  (Id. at 25–27.)

### 2.  Applicable law

The Ninth Circuit has established a two-part test for evaluating a claimant's allegations regarding subjective symptoms.  See Trevizo v. Berryhill, 871 F.3d 664, 678 (9th Cir. 2017); see also Social Security Ruling ("SSR") 16-3p, 2016 WL 1119029 (Mar. 16, 2016).  First, the ALJ determines whether there is "objective medical evidence of an underlying impairment that could reasonably be expected to produce the pain or other symptoms alleged."  Trevizo, 871 F.3d at 678 (quoting Garrison v. Colvin, 759 F.3d 995, 1014–15 (9th Cir. 2014)).  Second, if a claimant presented such evidence, and there is no evidence of malingering, the ALJ may reject the claimant's statements about the severity of the claimant's symptoms "only by offering specific, clear and convincing reasons for doing so."  Id.

When evaluating subjective symptom testimony, "[g]eneral findings are insufficient."  Brown-Hunter v. Colvin, 806 F.3d 487, 493 (9th Cir. 2015).  "[A]n ALJ does not provide specific, clear, and convincing reasons for rejecting a claimant's testimony by simply reciting the medical evidence in support of his or her residual functional capacity determination."  Id. at 489.  Instead, the ALJ must identify the testimony regarding the claimant's symptoms that the ALJ finds not credible, and explain what evidence undermines the claimant's testimony.  See Lambert v. Saul, 980 F.3d 1266, 1277 (9th Cir. 2020) (citing Treichler v. Comm'r of Soc. Sec. Admin., 775 F.3d 1090, 1102 (9th Cir. 2014)); see also Burrell v. Colvin, 775 F.3d 1133, 1139 (9th Cir. 2014) (finding error where the ALJ "never connected the medical record" to the

claimant's testimony, and did not make "a specific finding linking a lack of medical records to [the claimant's] testimony about the intensity" of her symptoms); Orteza v. Shalala, 50 F.3d 748, 750 (9th Cir. 1995) (providing that the ALJ's reasons for discounting a claimant's testimony must be "sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discount the claimant's testimony").

"Because symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone," the ALJ considers "all of the evidence presented," including information about the claimant's prior work record, statements about symptoms, evidence from medical sources, and observations by the Agency's employees and other individuals. See 20 C.F.R. §§ 404.1529(c)(3); SSR 16-3p, 2016 WL 1119029. In addition, the ALJ may consider other factors, such as the claimant's daily activities; the location, duration, frequency, and intensity of pain or other symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain; treatment; and any other measures used to relieve pain. See 20 C.F.R. §§ 404.1529(c)(3); SSR 16-3p, 2016 WL 1119029.

### 3. Analysis

The parties do not dispute the ALJ's finding that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms. (AR at 27; see also J. Mot.) Accordingly, the first prong of the ALJ's inquiry regarding Plaintiff's subjective symptoms is satisfied.

Turning to the second prong of the ALJ's inquiry, neither party alleges that the ALJ found that Plaintiff was malingering. (See J. Mot.) The Court therefore is required to determine whether the ALJ identified which of Plaintiff's subjective allegations of impairment he discounted, and whether the ALJ provided specific, clear, and convincing reasons for doing so. See Brown-Hunter, 806 F.3d at 489; Lambert, 980 F.3d at 1277.

The ALJ concluded that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms [we]re not entirely consistent with the medical evidence and other evidence in the record." (AR at 27.) The ALJ then

discounted Plaintiff's subjective symptom testimony citing the following reasons: (1) the medical evidence was not fully consistent with Plaintiff's reported symptoms and limitations, and (2) Plaintiff's allegations of disabling symptoms were not consistent with her daily activities, including her part-time work.  (Id. at 27–28.)

Although Defendant cites an additional reason to support the ALJ's decision to discount Plaintiff's subjective symptom testimony—that Plaintiff improved with treatment, (J. Mot. at 21–22), the Court can only assess the reasoning the ALJ provided in his decision.  See Revels, 874 F.3d at 654 (stating that a court may consider "only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which [he or she] did not rely"); Bray v. Comm'r of Soc. Sec. Admin., 554 F.3d 1219, 1225 (9th Cir. 2009) ("Long-standing principles of administrative law require us to review the ALJ's decision based on the reasoning and factual findings offered by the ALJ—not post hoc rationalizations that attempt to intuit what the adjudicator may have been thinking.").  The Court will therefore examine the ALJ's stated reasons for discontinuing Plaintiff's testimony.

### a.  Inconsistency with medical evidence

The ALJ discounted Plaintiff's subjective symptom testimony because her statements regarding the intensity, persistence, and limiting effects of the symptoms were inconsistent with the medical evidence.  (AR at 27.)  The ALJ reasoned as follows:

> While the evidence supported work related limitations, it was not fully consistent with a finding of disability.  The claimant reported she regularly experienced pain, numbness, stiffness and weakness involving her neck and upper extremities.  However, there were many exams where the claimant had normal extremities, full range of motion and had intact muscle strength, grip strength, sensation and reflexes (1F/173, 246; 3F/7, 17, 34, 48, 87; 6F; 8F/2; 9F/72; 14F/24-25).  Exams also noted the claimant consistently walked with a normal gait and did not use an assistive device (3F/34, 48, 57; 6F; 9F/54).  There were many exams where the claimant denied having symptoms such as pain, numbness or weakness (3F/71; 5F/21, 37; 8F/1; 9F/53; 13F/294).  Many exams noted the claimant appeared comfortable and in no acute distress (1F/110, 163, 168, 172, 175, 179, 230; 3F/38; 8F/2, 8).  The claimant also often [had] [sic] only mild or moderate pain (12F/13, 25, 32, 35, 40, 53, 94;

14F/18).  Furthermore, imaging of the claimant's spine showed intact hardware and only mildly to moderately severe findings (1F/124, 176, 203; 3F/35).  Imaging of the claimant's left shoulder was unremarkable (8F/1).  While the claimant required two spinal surgeries, the claimant reported doing well after her surgeries and that the procedures result[ed] [sic] in symptom reduction (1F/172, 175, 246).  In terms of the claimant's migraines, she reported experiencing frequent and severe migraines.  However, there were many exams where the claimant denied having a migraine (1F/345; 3F/61, 71; 5F/7, 17, 25, 37; 9F/53).  During a recent exam, she reported headaches that only occurred intermittently (9F/9). There were many exams where the claimant appeared alert and was in no acute distress (1F/110, 163, 168, 172, 175, 179, 230; 3F/38; 8F/2, 8). The claimant also received generally conservative treatment for her headaches.  There was no evidence she required hospitalization or any aggressive or invasive treatment for her headaches.

(Id. at 27–28 (emphases added).)

Generally, the ALJ may not reject the claimant's subjective complaints based *solely* on a lack of medical evidence to fully corroborate the alleged severity of pain. Burch v. Barnhart, 400 F.3d 676, 680 (9th Cir. 2005).  However, "when objective medical evidence in the record is *inconsistent* with the claimant's subjective testimony, the ALJ may indeed weigh it as undercutting such testimony."  Smartt v. Kijakazi, 53 F.4th 489, 498 (9th Cir. 2022) (explaining that Burch does not forbid the ALJ from using inconsistent objective medical evidence in the record to discount subjective symptom testimony).  Contradiction of the claimant's subjective complaints with the medical record is a sufficient basis for rejecting the claimant's subjective testimony.  See Carmickle v. Comm'r, Soc. Sec. Admin., 533 F.3d 1155, 1161 (9th Cir. 2008).  The ALJ must identify "specific, clear, and convincing examples" that contrast the claimant's "subjective [] testimony with objective medical evidence."  Smartt, 53 F.4th at 499.

In this case, Plaintiff testified during her January 27, 2022 administrative hearing that she was not able to work because she *regularly* experiences pain in her neck and shoulder when performing basic tasks, like sitting, and *regularly* had numbness and weakness in her upper extremities.  (See AR at 48–49, 52–57.)  The ALJ determined that, contrary to Plaintiff's allegations regarding the severity of her symptoms, Plaintiff's

medical records demonstrated that during many examinations she had a full range of motion and intact muscle strength, grip strength, sensation, and reflexes.  (See id. at 27; see also id. at 631 (containing August 7, 2018 examination notes documenting Plaintiff's reports that she her neck pain and pain radiating down her left arm was "gone," and her strength had returned); id. at 873, 887, 926, 1076, 1087, 1170, 1874–75 (containing May 2019–January 2022 examination notes documenting that Plaintiff's strength and gait were normal, and she had a full range of motion.)  The ALJ also concluded that contrary to Plaintiff's allegations of persistent severe pain, her medical records contained multiple examination notes documenting Plaintiff's reports of mild-to-moderate pain.  (See id. at 27; see also id. at 1361, 1373, 1379, 1383, 1387, 1401, 1405, 1416, 1424, 1428, 1435, 1442, 1446, 1451, 1457, 1460, 1468 (containing physical therapy records from July 2021–December 2021, documenting Plaintiff's reports of mild-to-moderate pain in her neck and shoulder); id. at 1868 (containing a follow-up intake form for the spine clinic on January 31, 2022, noting that Plaintiff's pain level was 1–2/10).)  Furthermore, the ALJ cited records containing Plaintiff's reports that she was "doing well" after her surgery with symptom reduction.  (See id. at 27; see also id. at 557, 631 (containing August 7, 2018 examination note documenting Plaintiff's report that she was "doing very well.  The deep neck pain she was feeling [was] gone[,] as well as the pain that was radiating down the left arm."); id. at 560 (containing a treatment note dated October 1, 2018, documenting Plaintiff's report "that the pain she was having in the neck prior to surgery and the pain that went down her left arm ha[d] improved.").)  Notably, the ALJ also cited Plaintiff's imaging records that were either "unremarkable" or showed mild-to-moderate findings and intact hardware.  (See id. at 27 (citing id. at 509, 561, 588, 874).)  Finally, the ALJ cited records containing Plaintiff's reports of pain relief from medication.  (See id. at 27; see also id. at 1086 (containing treatment note dated November 3, 2020, documenting Plaintiff's report that she "has been taking Percocet which she uses for chronic pain with some relief of symptoms"); id. at 1166 (containing March 31, 2021

treatment note documenting Plaintiff's report that "with Lyrica her sensation of tingling and numbing has improved somewhat").)

Additionally, Plaintiff testified that she was experiencing frequent and severe migraines that affected her ability to work. (AR at 48–49, 58–59.) The ALJ determined that contrary to Plaintiff's allegations of frequent and severe headaches, during many examinations Plaintiff reported "intermittent" headaches or no headaches. (Id. at 27–28; see also id. at 900, 910, 1018, 1028, 1036, 1048, 1107, 1151 (reporting no headache symptoms during some examinations from February 4, 2020–February 26, 2021); id. at 1107 (reporting during August 17, 2020 examination that "migraine [headache] intermittently").) The ALJ also reasoned that Plaintiff received generally conservative treatment for her headaches and there was no evidence that she required hospitalization, or aggressive or invasive treatment. (Id. at 28.) The Court notes that although there were examinations during which Plaintiff reported experiencing headaches, during most recent physical therapy examination on December 9, 2021, the physical therapist noted that Plaintiff "had a decrease in headache and neck pain." (See id. at 507, 530, 569, 594, 856, 872, 924, 1470); see also Tommasetti, 533 F.3d at 1041 ("[T]he ALJ is the final arbiter with respect to resolving ambiguities in the medical evidence."); Benton, 331 F.3d at 1040 (same).

The ALJ's determination was therefore supported by substantial evidence in the record. Accordingly, the ALJ provided clear and convicting reason, supported by substantial evidence in the record, to discount Plaintiff's subjective symptom testimony.

**b. Daily activities**

The ALJ also discounted Plaintiff's subjective symptom testimony because she "reported being able to perform a wide range of daily activities." (AR at 28.) Specifically, the ALJ stated that:

> [Plaintiff] reported being able to tend to her personal care and hygiene, do laundry, prepare meals, drive, wash dishes and go shopping (6F). She reported providing on going care for her mother after her mother suffered a stroke (5F/10). During one exam, she reported going on walks and walking up to

26

1    four miles (1F/175).  The claimant also reported working part time as a driver
2    who delivers orders to customers (Testimony).

3    (Id.)  The ALJ then concluded that "[s]ome of the physical and mental abilities and social
4    interactions required in order to perform these activities are the same as those necessary
5    for obtaining and maintaining employment," and that the Plaintiff's "ability to participate
6    in such activities diminishes the persuasiveness of the [Plaintiff's] functional limitations."
7    (Id.)

8        An ALJ may properly consider the claimant's daily activities in evaluating
9    testimony regarding subjective symptoms.  See 20 C.F.R. §§ 404.1529(c)(3)(i).  An ALJ
10   may discount a claimant's subjective symptom testimony on the following grounds:
11   (1) the claimant's daily activities involved skills that contradict the claimant's other
12   testimony, or (2) the claimant's daily activities meet the threshold for transferable work
13   skills.  Orn v. Astrue, 495 F.3d 625, 639 (9th Cir. 2007).  In this case, the ALJ relied on
14   the second ground and found that Plaintiff's activities were transferable to the workplace
15   setting.  (AR at 28); Orn, 495 F.3d at 639; see also Bunnell v. Sullivan, 947 F.2d 341,
16   346 (9th Cir. 1991) ("[I]f the claimant engages in numerous daily activities involving
17   skills that could be transferred to the workplace, an adjudicator may discredit the
18   claimant's allegations upon making specific findings relating to the claimant's daily
19   activities.").

20       The ALJ cited Plaintiff's ability to "tend to her personal care and hygiene," do
21   laundry, prepare meals, drive, wash dishes, and go shopping.  (AR at 28 (citing id. at
22   1071–78).)  The ALJ also cited Plaintiff's reports that she provided ongoing care for her
23   mother after her mother suffered a stroke and that she went on walks for up to four miles.
24   (Id. at 28 (citing id. at 1021); see also id. at 560 (reporting that she was able to walk four
25   miles after her surgery); id. at 1021 (reporting that she cared for her mother).)  The Court
26   also notes that consistent with the ALJ findings, other medical records in this case
27   evidence Plaintiff's ability to care for her mother during the relevant time frame.  (See id.
28   at 1320 (containing Plaintiff's February 22, 2019 report that she was "stressed out"

because she was taking care of her mother who had suffered a stroke); id. at 548 (containing Plaintiff's report on May 29, 2018, that she was "the sole provider for her mother who has had a stroke").)  These activities are similar to activities that, under Ninth Circuit precedent, were found to involve skills that could be transferred to a workplace.  See Burch, 400 F.3d at 681 (finding that the claimant's daily activities could reasonably be found to be transferrable to a workplace, where the activities suggested that the claimant was "quite functional" because she was able to care for her personal needs, cook, clean, shop, interact with her nephew and boyfriend, and manage her and her nephew's finances); Stubbs-Danielson v. Astrue, 539 F.3d 1169, 1175 (9th Cir. 2008) (finding that the claimant's activities of cooking, house cleaning, doing laundry, and helping her husband in managing finances "suggest[ed] the claimant may still be capable of performing the basic demands of competitive, remunerative, unskilled work on a sustained basis"); see also Dominic I. v. Kijakazi, Case No. 2:20-cv-05737-MAA, 2022 WL 3101716, at *4–5 (C.D. Cal. Aug. 3, 2022) (finding that the ALJ made specific findings that plaintiff's daily activities met the threshold of transferable work skills, where the ALJ cited plaintiff's ability to attend AA meetings, grocery shop for himself and his mother, and act as a caregiver for his mother by cleaning, cooking, and gardening).

Notably, the ALJ also cited Plaintiff's part-time work delivering orders for Uber Eats.  (AR at 28.)  "An ALJ may consider any work activity, including part-time work, in determining whether a claimant is disabled."  Ford v. Saul, 950 F.3d 1141, 1156 (9th Cir. 2020); Richardson v. Comm'r of Soc. Sec., 588 F. App'x 531, 533 (9th Cir. 2014) (finding that the claimant's "ability to work part-time after applying for benefits" supported the ALJ's decision to discount the claimant's testimony); Carter v. Astrue, 472 F. App'x 550, 552 (9th Cir. 2012) (finding that the ALJ properly discounted the claimant's allegations, in part, because the claimant "worked part-time for nearly another year after his alleged disability onset date"); see also Bray, 554 F.3d at 1227 (finding that the "ALJ made specific findings in support of his decision to discount [the claimant's]

testimony," including that she "recently worked as a personal caregiver for two years, and has sought out other employment").

In this case, Plaintiff testified that she worked as an Uber Eats driver part-time for about twelve hours per week.  (AR at 46–47.)  Plaintiff's medical records also contain evidence documenting that Plaintiff was driving for Uber Eats up to seven hours per day.  (Id. at 1353 (containing Plaintiff's July 26, 2021 report that she drove for Uber Eats from 12:00 p.m.–7:00 p.m.); id. at 1365 (containing Plaintiff's August 4, 2021 report that she drove for Uber Eats in the morning).)  The Court notes that although the ALJ did not acknowledge that on several occasions Plaintiff reported difficulty performing certain daily activities, (see id. at 55–60, 1073), the ALJ nevertheless reasonably concluded that Plaintiff's ability to participate in such activities "diminishe[d] the persuasiveness of [Plaintiff's] allegations of functional limitations," (id. at 28).  The ALJ therefore reasonably found that Plaintiff's ability to work part-time as an Uber Eats driver undermined her allegations of debilitating symptoms.  See Valentine v. Comm'r Soc. Sec. Admin., 574 F.3d 685, 693 (9th Cir. 2009) ("The ALJ recognized that this evidence did not suggest [the claimant] could return to his old job," but "thought it did suggest that [the claimant's] later claims about the severity of his limitations were exaggerated.").

Accordingly, the ALJ reasonably discounted Plaintiff's allegations of debilitating symptoms because Plaintiff engaged in daily activities, which involved skills that were transferable to a work setting.  See Dana R. v. Kijakazi, Case No. 5:21-cv-00163-MAA, 2022 WL 22871656, at *5 (C.D. Cal. Feb. 14, 2022) (finding that the ALJ reasonably concluded that plaintiff's testimony about working as a food delivery driver for Postmates undermined plaintiff's allegation of debilitating pain; concluding that this was a clear and convincing reason to discount plaintiff's subjective complaints); Dominic I., 2022 WL 3101716, at *4 (finding that "the ALJ reasonably interpreted [p]laintiff's ability to perform seasonal work . . . as inconsistent with his allegations that he was unable to perform any work"; concluding that this was a clear and convincing reason to discount plaintiff's subjective complaints).)  Therefore, Plaintiff's daily activities during the

relevant timeframe was a clear and convincing reason, supported by substantial evidence in the record, to discount her subjective symptom allegations.

### c. Conclusion

The ALJ discounted Plaintiff's subjective symptom testimony because it was inconsistent with the medical record, and because Plaintiff's daily activities, which included providing care for her mother and part-time work as an Uber Eats driver, involved skills that could be transferred to the workplace. Those reasons were supported by substantial evidence, and the ALJ provided clear and convincing reasons for discounting Plaintiff's testimony.

## C.    The ALJ's RFC Assessment is Supported by Substantial Evidence

### 1. Parties' arguments

Plaintiff argues that in assessing her RFC, the ALJ failed to properly consider laboratory findings, lay testimony, and the effects of treatment and pain symptoms. (J. Mot. at 27.) Specifically, Plaintiff reasserts her argument that the ALJ failed to consider her cervical radiculopathy despite the cervical MRIs, EMG/NCV test, and CT scans. (Id. at 28 (citing AR 479–51, 747–49, 751–52, 873–74, 1098).) Plaintiff also contends that the ALJ erred by discounting her daughter's testimony regarding the frequency and severity of Plaintiff's migraines. (J. Mot. at 29.) Plaintiff further states that the ALJ mischaracterized her improvement with medication and failed to consider the ineffectiveness of medication and physical therapy, as well as the effects of her pain symptoms. (See id. at 30–34.) Plaintiff argues that the ALJ's assessed RFC does not accurately address Plaintiff's physical limitations, and the ALJ's error was not harmless because the ALJ's RFC assessment was not supported by substantial evidence. (Id. at 32–34.)

Defendant responds that substantial evidence supported the ALJ's RFC finding. (Id. at 34–43.) Defendant contends that Plaintiff has not challenged the ALJ's assessment of the opinion evidence and the prior administrative medical findings, and points out that no physician opined that Plaintiff was more limited than the ALJ

determined.  (Id. at 34–35.)  Defendant further asserts that the ALJ explicitly discussed the imaging and EMG evidence, and their relation to Plaintiff's mild left-sided radiculopathy.  (Id. at 35 (citing AR at 25).)  Defendant also states that the ALJ was not required to discuss non-medical evidence from Plaintiff's daughter and argues that because the ALJ provided valid reasons to discount Plaintiff's statements, those reasons were sufficient to discount Plaintiff's daughter's statements.  (J. Mot. at 36–39 (citing Valentine, 574 F.3d at 694.)  Additionally, Defendant maintains that Plaintiff improperly conflates "improved" with "cured," and that the "ALJ was not required to elevate Plaintiff's claims of pain over other evidence inconsistent with her subjective statements."  (J. Mot. at 39–43.)

### 2. Applicable law

RFC refers to what the claimant can do in a work setting, despite the claimant's mental or physical limitations caused by impairments or related symptoms.  20 C.F.R. § 404.1545(a)(1); see also SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996) (providing that an RFC "is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis.").  In assessing the claimant's RFC, the ALJ must consider all of the claimant's medically determinable impairments, including nonsevere medically determinable impairments.  20 C.F.R. § 404.1545(e).  "[A]n ALJ must consider all relevant evidence in the record, including, *inter alia*, medical records, lay evidence, and 'the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment.'"  Robbins v. Soc. Sec. Admin., 466 F.3d 880, 883 (9th Cir. 2006) (quoting SSR 96–8p, 1996 WL 374184, at *5).  Careful consideration must be given to "any evidence about symptoms, 'because subjective descriptions may indicate more severe limitations or restrictions than can be shown by medical evidence alone.'"  Id.

The RFC is not a medical opinion, but a legal decision that is expressly reserved for the Commissioner.  See 20 C.F.R. § 404.1546(c); Vertigan v. Halter, 260 F.3d 1044, 1049 (9th Cir. 2001) (citing 20 C.F.R. § 404.1545) ("It is clear that it is the responsibility

of the ALJ, not the claimant's physician, to determine residual functional capacity."). Where "the record contains conflicting medical evidence, the ALJ is charged with determining credibility and resolving the conflict." Benton v. Barnhart, 331 F.3d 1030, 1040 (9th Cir. 2003); see also Tommasetti, 533 F.3d at 1041 ("the ALJ is the final arbiter with respect to resolving ambiguities in the medical evidence"); Morgan v. Comm'r of Soc. Sec. Admin., 169 F.3d 595, 603 (9th Cir. 1999) (holding that ALJ was "responsible for resolving conflicts" and "internal inconsistencies" within physician's reports). In determining whether an ALJ committed error in assessing the RFC, the relevant inquiry is whether the medical evidence supports the ALJ's finding. See Stubbs-Danielson, 539 F.3d at 1173–74 (holding that the RFC assessment adequately captured restrictions when it was consistent with the concrete limitations in the medical opinions); see also Schneider v. Comm'r of Soc. Sec. Admin., 433 F. App'x 507, 509 (9th Cir. 2011) (concluding that the ALJ's failure to address claimant's migraines was harmless because the medical record did not support finding that migraines would affect claimant's functioning at work).

### 3. Analysis

Plaintiff cites selective incidents in the record and argues that substantial evidence does not support the ALJ's finding that Plaintiff could perform a range of light work. (See J. Mot. at 28–34 (citing the ALJ's failure to consider Plaintiff's laboratory findings documenting cervical radiculopathy); id. at 29 (citing the ALJ's decision to discount Plaintiff's daughter's testimony); id. at 30–34 (citing ALJ's alleged failure to consider the effects of treatment and pain symptoms).) Plaintiff's argument lacks merit. As discussed in detail in section VI.A.3 of this Order, the ALJ considered Plaintiff's cervical radiculopathy symptoms and laboratory findings in the RFC analysis. Further, as discussed in section VI.B.3.a, the ALJ also considered the effects of Plaintiff's treatment and pain symptoms. The ALJ acknowledged Plaintiff's workplace limitations due to evidence of her symptoms, and cited records to reject Plaintiff's allegations regarding the intensity, persistency, and limiting effects of her symptoms. (See AR at 26–28.)

In addition, the ALJ's written decision demonstrates that he properly considered the third-party report from Plaintiff's daughter Taliyah.  (Id. at 25 (citing id. at 368).)  For claims filed on or after March 27, 2017, the ALJ is required to "consider" lay witness testimony, which fits under the category of "evidence from nonmedical sources."  See 20 C.F.R. § 404.1513(a) ("We consider evidence under §§ 404.1520b, 404.1520c"); id. § 404.1513(a)(4) (providing that "[e]vidence from nonmedical sources" is one of the five categories of evidence).  While an ALJ must consider lay witness statements, the ALJ is "not required to articulate how [he or she] considered evidence from nonmedical sources using the requirements in paragraphs (a)–(c) in [20 C.F.R. § 404.1520c]."  Id. § 404.1520c(d) (emphasis added).  "An ALJ may disregard lay testimony so long as he 'gives reasons germane to each witness for doing so.'"  Wright v. Saul, 857 F. App'x 380, 382 (9th Cir. 2021); see also Diedrich v. Berryhill, 874 F.3d 634, 640 (9th Cir. 2017) (citation omitted) ("Lay testimony as to a claimant's symptoms is competent evidence that an ALJ must take into account, unless he or she expressly determines to disregard such testimony and gives reasons germane to each witness for doing so.").

In this case, the ALJ specifically noted that Plaintiff's daughter stated in her report that Plaintiff was sensitive to light and had trouble functioning due to migraines, and that her mother had headaches several times a month lasting multiple days.  (AR at 25 (citing id. at 368).)  The ALJ also noted Plaintiff's daughter's report that Plaintiff had difficulty eating, bathing, and remembering to take her medications due to headaches.  (Id.)  Although the ALJ did not give specific reasons to discount Plaintiff's daughter's statements, (see id. at 25), as Defendant correctly points out, when a claimant's subjective symptom testimony is similar to the third-party testimony, and the ALJ cites clear and convincing reasons to reject the claimant's subjective symptom testimony, those reasons are sufficient to discount testimony from third parties.  (J. Mot. at 38 (citing Valentine, 574 F.3d at 694; Howland v. Saul, 804 F. App'x 467, 471 (9th Cir. 2020) ("The ALJ recognized that [third party's] statements largely expressed the same limitations described in [plaintiff's] own testimony, which the ALJ properly discounted"); Jennings

v. Saul, 804 F. App'x 458, 463 (9th Cir. 2020) ("[B]ecause the ALJ offered specific, clear and convincing reasons for discounting [plaintiff's] own testimony, and because the lay testimony repeated the same limitations, the ALJ provided a germane reason for rejecting [lay] testimony").)

In this case, Plaintiff's testimony, as well as her daughter's statements regarding Plaintiff's migraine symptoms, were similar. (See AR at 48–49, 368.) Specifically, similar to Plaintiff's daughter's statements in her report, Plaintiff testified that she was sensitive to light, which caused her migraines to last multiple days and significantly affected her ability to function. (Id. at 48–49.) As discussed above, the ALJ provided clear and convincing reasons for rejecting Plaintiff's testimony because it was inconsistent with the medical record, and because Plaintiff's daily activities involved skills that could be transferred to the workplace. Notably, the ALJ considered Plaintiff's migraine symptoms described in Plaintiff's daughter's report during his RFC analysis. (Id. at 24–29.) Further, in his assessed RFC the ALJ limited Plaintiff to work that does not have "exposure to bright lights" to prevent Plaintiff's migraines. (Id. at 24.) Accordingly, because the ALJ provided clear and convincing reasons to discount Plaintiff's subjective symptom testimony, the same reasons suffice to discount statements from her daughter regarding Plaintiff's migraine symptoms and limitations. See Valentine, 574 F.3d at 694 (explaining that when the ALJ offers, "clear and convincing reasons for rejecting [Plaintiff's] own subjective complaints, . . . it follows that the ALJ also gave germane reasons for rejecting [the third party's] testimony").

Additionally, in making his RFC determination, the ALJ carefully considered the findings from Plaintiff's examining physician, Dr. Tran, and state agency medical consultants, Drs. Yee and Chu, whose findings Plaintiff does not challenge. (See AR at 28–29.) Importantly, all three physicians determined that Plaintiff could perform light work. (See e.g., id. at 79, 111 (noting that Plaintiff had limitations in her ability to perform work, but the limitations did not prevent her from performing work she had performed in the past); id. at 1077 (noting Dr. Tran's finding that, other than occasional

driving, Plaintiff did not have workplace limitations).)  Courts have regularly concluded that RFC determinations that deviate slightly from specific medical findings regarding the claimant's limitations, or synthesize findings from the record, can be supported by substantial evidence.  See Rounds, 807 F.3d at 1005–06 (providing that an ALJ's RFC determination may deviate slightly from a medical provider's treatment recommendation); Blake R. v. Kijakazi, Case No.: 3:20-cv-01759-AHG, 2022 WL 4553125, at *7 (S.D. Cal. Sept. 29, 2022) (citing SSR 96-6p, 1996 WL 374180, at *1 n.1; 20 C.F.R. §§ 404.1502, 404.1513a, 404.1520c) (stating that "an ALJ can rely on the opinions of non-treating state agency consulting physicians to support an RFC determination"; also noting that such reliance was appropriate even where the ALJ's assessed "RFC was more restrictive than the state agency consulting physicians' opinion"); Wasson v. Kijakazi, Case No. 2:22-cv-00484-NJK, 2022 WL 14577078, at *5 (D. Nev. Oct. 25, 2022) (finding that because "the ALJ adopted many of the recommendations contained in the medical opinion evidence," the ALJ's assessed RFC did not have to "specifically match a physician's recommended limitations"); Donna M. v. Saul, Case No. ED CV 18-2554-SP, 2020 WL 1550212, at *5 (C.D. Cal. Mar. 31, 2020) ("An ALJ must consider opinions from medical sources, but is not required to adopt verbatim a medical opinion because the RFC determination is ultimately reserved to the Commissioner."); Valenna v. Colvin, NO. C15-1498-RAJ-JPD, 2016 WL 4367600, at *6 (W.D. Wash. June 15, 2016) (citing Chapo v. Astrue, 682 F.3d 1285, 1288 (10th Cir. 2012)) ("[a]n RFC finding need not directly correspond to a specific medical opinion."), report and recommendation adopted, 2016 WL 4263047 (W.D. Wash. Aug. 12, 2016).  The ALJ's assessed RFC in this case aligned with the limitations assessed by an examining physician and state agency medical consultants because it limited Plaintiff to light work and adopted additional *more restrictive* limitations.  (See id. at 28–29.)

Accordingly, on the record before the Court relating to Plaintiff's limitations, the Court concludes that the ALJ's assessed RFC was supported by substantial evidence. The ALJ therefore did not err in this aspect of his decision.

### 4. Conclusion

In assessing Plaintiff's RFC, the ALJ properly considered relevant medical records, third party statements regarding Plaintiff's symptoms, and Plaintiff's physicians' opinions. The ALJ weighed the relevant evidence in the record and determined that Plaintiff was restricted to light work with accommodations for her reduced mobility and migraines. Accordingly, the ALJ's assessed RFC was supported by substantial evidence.

### VII.  CONCLUSION

For the reasons stated above, the Court finds that although the ALJ erred at step two of his sequential evaluation process by not considering Plaintiff's radiculopathy symptoms, the error was harmless. The Court further finds that the ALJ properly discounted Plaintiff's subjective symptom testimony. Additionally, the Court finds that the ALJ's assessed RFC was supported by substantial evidence. Accordingly, the Court **ORDERS** that judgment be entered affirming the decision of the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) and dismissing this case.

**IT IS SO ORDERED.**

Dated:  December 10, 2024

_____

Honorable Lupe Rodriguez, Jr.
United States Magistrate Judge